782 S.E.2d 223

STATE of West Virginia ex rel. Belinda BIAFORE, Chair of the West Virginia State Democratic Committee; and Stephen Davis, Linda Klopp, David Thompson, Linda Phillips, Stephen Evans, and Patricia Blevins, Members of the West Virginia Democratic Executive Committee for the Ninth Senatorial District, Petitioners

v.

Earl Ray TOMBLIN, Governor of the State of West Virginia; and Beverly R. Lund, Justin M. Arvon, Sue "Naomi" Cline, Tony Paynter, John Doe, and Jane Doe, Members of the West Virginia Republican Executive Committee for the Ninth Senatorial District, Respondents

and

State of West Virginia, by its Attorney General Patrick Morrisey, Intervenor.

No. 16–0013.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 19, 2016.

Decided Jan. 22, 2016.

Anthony J. Majestro, Esq., Powell & Majestro, PLLC, Charleston, WV, for Petitioners, West Virginia Democratic Executive Committee for the Ninth Senatorial District.

Peter G. Markham, Esq., General Counsel, Office of Governor Earl Ray Tomblin Charleston, WV, for Respondent Governor Tomblin.

Vincent Trivelli, Esq., The Law Office of Vincent Trivelli, PLLC, Morgantown, WV, Thomas Patrick Maroney, Esq., Maroney, Williams, Weaver & Pancake PLLC, Charleston, WV, for Amicus Curiae, West Virginia State Building and Construction Trades Council, AFL–CIO and the Affiliated Construction Trades Foundation.

J. Mark Adkins, Esq., Patrick C. Timony, Esq., Bowles Rice LLP, Charleston, WV, for Beverly R. Lund, Justin M. Arvon, Sue "Naomi" Cline, and Tony Paynter.

Mark A. Carter, Esq., Dinsmore & Shohl LLP, Charleston, WV, for Beverly R. Lund, Justin M. Arvon, Sue "Naomi" Cline, and Tony Paynter.

Patrick Morrisey, Esq., Attorney General, Elbert Lin, Esq., Solicitor General, J. Zak Ritchie, Esq., Assistant Attorney General, Charleston, WV, for Intervenor State of West Virginia.

John M. Canfield, Esq., Vice President & Counsel for Amicus Curiae, West Virginia Chamber of Commerce, Charleston, WV, Jeffrey M. Wakefield, Esq., Wesley P. Page, Esq., Keith R. Hoover, Esq., Flaherty Sensabaugh & Bonasso., for Amicus Curiae, William P. Cole, III, President of the West Virginia Senate.

Workman, Justice:

On January 8, 2016, the petitioners, Belinda Biafore, Chair of the West Virginia State Democratic Executive Committee, and the members of the West Virginia Democratic Executive Committee for the Ninth Senatorial District (hereinafter "petitioners"), petitioned this Court, requesting the issuance of a writ of mandamus against the respondents, Governor Earl Ray Tomblin and members of the West Virginia Republican Executive Committee for the Ninth Senatorial District (hereinafter "respondents"). Through this request for extraordinary relief, the petitioners seek to compel Governor Tomblin to fill the current vacancy in the West Virginia Senate from a list of three candidates to be selected by the petitioners.

On January 11, 2016, the respondent, Governor Tomblin, filed a summary response to the petition. The respondent members of the West Virginia Republican Executive Committee for the Ninth Senatorial District filed a response in opposition to the petition on January 12, 2016. West Virginia Attorney General Patrick Morrisey filed an intervenor's brief.

On January 13, 2016, this Court issued a rule to show cause and ordered the respondents to show cause, if any, why a writ of mandamus should not be awarded as requested by the petitioners. Oral argument was conducted on January 19, 2016.[1]

I. Factual and Procedural History

Daniel Jackson Hall was elected to the West Virginia Senate in the 2012 general election as the Democratic senator in the Ninth Senatorial District. In November 2015, Senator Hall changed parties and became a Republican. On December 29, 2015, Senator Hall announced his resignation from the Senate, effective January 3, 2016, which created the vacancy at the center of this dispute. An immediate discussion ensued regarding whether Governor Tomblin was required to replace Senator Hall with a Democrat or a Republican.

On January 5, 2016, Attorney General Patrick Morrissey issued an opinion of the Attorney General concluding that Governor Tomblin was required to replace Senator Hall with a Republican from one of three names submitted by the respondent members of the West Virginia Republican Executive Committee for the Ninth Senatorial District, pursuant to the provisions of West Virginia Code § 3–10–5 (2013).

In the Petition for Writ of Mandamus currently before this Court, the petitioners contend West Virginia Code § 3–10–5 is ambiguous and should be interpreted to preserve the mandate of the voters when a legislative vacancy occurs. Because the voters of the Ninth Senatorial District elected Senator Hall as a Democrat, the petitioners argue the

---

1. This Court expresses appreciation for the amicus briefs filed in this matter.

voters' mandate can best be preserved by interpreting the statute to require Governor Tomblin to appoint a Democrat from the three names to be submitted by the petitioners.

## II. Mandamus

■ This Court has consistently held "[m]andamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies." Syl. Pt. 1, *State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.*, 151 W.Va. 207, 151 S.E.2d 102 (1966). Generally,

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syl. Pt. 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969).

■ Cognizant of the need for alacrity in matters affecting the right to political office, this Court has recognized that "[i]n West Virginia a special form of mandamus exists to test the eligibility to office of a candidate in either a primary or general election." Syl. Pt. 5, in part, *State ex rel. Maloney v. McCartney*, 159 W.Va. 513, 223 S.E.2d 607 (1976). In special mandamus election cases, "[b]ecause there is an important public policy interest in determining the qualifications of candidates in advance of an election, this Court does not hold an election mandamus proceeding to the same degree of procedural rigor as an ordinary mandamus case." Syl. Pt. 2, *State ex rel. Bromelow v. Daniel*, 163 W.Va. 532, 258 S.E.2d 119 (1979). In that same vein, we have explained that "when a writ of mandamus has been invoked to preserve the right to vote or to run for political office . . . this Court has eased the requirements for strict compliance for the writ's preconditions, especially those relating to the availability of another remedy." Syl. Pt. 3, in part, *State ex rel. Sowards v. Cty. Comm'n of Lincoln Co.*, 196 W.Va. 739, 474 S.E.2d 919 (1996).

Applying these principles to this matter, we view the vacancy created by Senator Hall's departure as properly the subject of a writ of mandamus.

## III. Discussion

■ The case sub judice requires the application of settled principles of statutory application under which this Court must first determine whether the statutory text is plain and unambiguous. *See U.S. v. Gonzales*, 520 U.S. 1, 4, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). We have uniformly adhered to the principle that where a statute is plain and unambiguous, it is the clear and unmistakable duty of the judiciary to merely apply the language. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010); *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970); *Hood v. City of Wheeling*, 85 W.Va. 578, 102 S.E. 259 (1920); *Wellsburg and State Line R.R. Co. v. Panhandle Traction Co.*, 56 W.Va. 18, 48 S.E. 746 (1904). If the statutory text is clear and unambiguous, we must apply the statute according to its literal terms. *See, e.g., Dodd v. U.S.*, 545 U.S. 353, 357, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005).

■ In *State of West Virginia v. Continental Casualty Co.*, 130 W.Va. 147, 42 S.E.2d 820 (1947), this Court further elucidated this principle:

> When a statute is clear and unambiguous, and the legislative intent is plain, the statute should not be interpreted by the courts. 50 Am.Jur., Statutes, Section 225. *See State ex rel. McLaughlin v. Morris*, 128 W.Va. 456, 37 S.E.2d 85. In such case the duty of the courts is not to construe but to apply the statute. In applying the statute its words should be given their ordinary acceptance and significance and the meaning commonly attributed to them. 50 Am. Jur., Section 225. *See Moran v. Leccony Smokeless Coal Co.*, 122 W.Va. 405, 10 S.E.2d 578, 136 A.L.R. 1007 [ (1940) ].

130 W.Va. at 155, 42 S.E.2d at 825. In syllabus point two of *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951), the Court reiterated: "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted

by the courts but will be given full force and effect." The Court in *Epperly* also observed: "In such case the duty of the courts is not to construe but to apply the statute, and in so doing, its words should be given their ordinary acceptance and significance and the meaning commonly attributed to them." *Id.* at 884, 65 S.E.2d at 492. Courts are obligated to "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). When the language of a statute is unambiguous, "judicial inquiry is complete." *Rubin v. U.S.,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

▉ In view of these axiomatic principles, we emphasize that judicial interpretation of a statute is warranted *only* where the statute is ambiguous. Thus, unless the statute at issue is determined to be ambiguous, this Court is not permitted to engage in an examination of the public policy ramifications potentially resulting from its application or to comment upon the wisdom of the legislation as unambiguously expressed.

Turning to the issue before us, the statutory text frames our analysis. West Virginia Code § 3–10–5 addresses the filling of vacancies such as that created by Senator Hall's departure and provides as follows:

(a) Any vacancy in the office of State Senator or member of the House of Delegates shall be filled by appointment by the Governor, from a list of three legally qualified persons submitted *by the party executive committee of the party with which the person holding the office immediately preceding the vacancy was affiliated.* The list of qualified persons to fill the vacancy shall be submitted to the Governor within fifteen days after the vacancy occurs and the Governor shall duly make his or her appointment to fill the vacancy from the list of legally qualified persons within five days after the list is received. If the list is not submitted to the Governor within the fifteen-day period, the Governor shall appoint within five days thereafter a legally qualified person *of the same political party as the person vacating the office.*

(b) In the case of a member of the House of Delegates, the list shall be submitted by the party executive committee of the delegate district in which the vacating member resided at the time of his or her election or appointment. The appointment to fill a vacancy in the House of Delegates is for the unexpired term.

(c) In the case of a State Senator, the list shall be submitted by the party executive committee of the state senatorial district in which the vacating senator resided at the time of his or her election or appointment. The appointment to fill a vacancy in the State Senate is for the unexpired term, unless section one of this article requires a subsequent election to fill the remainder of the term, which shall follow the procedure set forth in section one of this article.

W. Va.Code § 3–10–5 (emphasis supplied).

In this case, the petitioners, as well as Governor Tomblin and *amicus curiae,* West Virginia ALF/CIO and the West Virginia State Building and Construction Trades Council, essentially argue that the subject statute is susceptible to differing interpretations. Specifically, they contend that the statute is unclear as to whether the party "affiliation" refers to the time of election or the time of vacancy.

To the contrary, the respondents, as well as *amicus curiae,* West Virginia Chamber of Commerce, the Attorney General's Office, and Senate President William Cole, argue that the language of the statute is unmistakably clear and requires the governor to select a replacement from a list submitted by the Republican Party's Ninth Senatorial District Executive Committee.

Upon this Court's review, we find West Virginia Code § 3–10–5 clear and unambiguous. It succinctly states the requirements for filling a vacancy in the West Virginia Legislature. Subsection (a) provides that a vacancy is to be filled through appointment by the governor. The list to be utilized by the governor in selecting the appointee is to be composed of "three legally qualified persons submitted by the party executive committee of the party with which the person holding the office immediately preceding the

vacancy was affiliated." W. Va.Code § 3–10–5(a). Subsection (a) also provides that if a list is not submitted within fifteen days, the governor is to appoint, within five days thereafter, "a legally qualified person of the same political party as the person vacating the office." *Id.*

Although subsection (c) provides instruction as to which geographic entity within the party is to submit the list of qualified candidates, that subsection does not affect the question of the party from which the list designated in subsection (a) is to be generated. Subsection (a) clearly provides that the list is to be submitted by the party with which the officeholder was most recently affiliated. *See id.* Thus, this Court finds the statute patently explicit, "admitting of no construction or application other than that which it clearly demands." *Martin v. Ellisor,* 266 S.C. 377, 223 S.E.2d 415, 418 (1976).

We reject petitioners' reasoning because their reading of the statute is profoundly strained and constitutes a misreading of statutory language that is clear in its meaning. They contend that the replacement for a vacating senator should be chosen from the political party with which he or she was affiliated *at the time of election* rather than the party with which he or she was affiliated *immediately preceding the vacancy.* As explained above, this Court is obligated to enforce the statute in accordance with its plain meaning. *State ex. rel. Safe–Guard Products Int'l v. Thompson,* 235 W.Va. 197, 200, 772 S.E.2d 603, 606 (2015) (holding that clear and unambiguous statute can not be interpreted by courts); *Stanley v. Stanley,* 233 W.Va. 505, 510, 759 S.E.2d 452, 457 (2014) (recognizing that statute is open to construction only where legislation is ambiguous); *Martin v. Hamblet,* 230 W.Va. 183, 187, 737 S.E.2d 80, 84 (2012) (finding that clear and unambiguous statutory provision will not be interpreted by courts).

It is undisputed that Senator Hall was affiliated with the Republican Party immediately preceding the vacancy and had been so

**2.** *See* Syl. Pt. 11, in part, *Brooke B. v. Donald Ray C., II,* 230 W.Va. 355, 738 S.E.2d 21 (2013) ("It is not for this Court to arbitrarily read into a statute that which it does not say."). The peti-

affiliated since November 2014. The legislature's use of the phrase "immediately preceding the vacancy" is manifestly plain, enunciating a specific and incontrovertible time criterion for the determination of the vacating officeholder's party affiliation.

Dissatisfied with the text of the statute, the petitioners sought to identify and apply an overarching legislative goal that purports to promote the will of the voters. However, any analysis which fails to provide reasonable meaning to the phrase "immediately preceding the vacancy" is wholly improper.[2] This Court will not alter the text in order to satisfy the policy preferences of the petitioners. They "should not seek to amend the statute by appeal to the Judicial Branch." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). "Preserving the separation of powers is one of this Court's most weighty responsibilities." *Wellness Int'l Network, Ltd. v. Sharif,* —— U.S. ——, 135 S.Ct. 1932, 1954–55, 191 L.Ed.2d 911 (2015) (Roberts, C.J., dissenting). In performing our constitutional duties, we decline the petitioners' request to encroach upon the power of the Legislature. "Liberty is always at stake when one or more of the branches seeks to transgress the separation of powers." *Clinton v. City of N.Y.,* 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring).

In advancing their arguments, the petitioners direct this Court's attention to opinions of other jurisdictions that have encountered ambiguous statutes. Such an approach proves unworkable because those decisions interpreted significantly dissimilar appointment statutes and they all were determined to involve ambiguous statutory language. In two cases primarily relied upon by the petitioners, *Richards v. Board of County Commissioners of Sweetwater County,* 6 P.3d 1251 (Wyo.2000), and *Wilson v. Sebelius,* 276 Kan. 87, 72 P.3d 553 (2003), the statutes at issue were silent as to the time-frame for determining the vacating official's party affiliation. Thus, the statutes were found to be

tioners' reading of the statute would render the statute's temporal reference to "immediately preceding the vacancy" superfluous.

ambiguous subsequent to vacancies occurring in the office after a political party change. The reviewing courts then embarked upon examinations of public policy arguments designed to support the mandate of the voters. While the principles advanced in *Richards* and *Wilson* are arguably laudable, this Court's role is to apply the language of our governing statute. Finding no ambiguity in the West Virginia statute, we are not permitted to engage in an analysis of public policy issues, as addressed in those other jurisdictions. The clear directive of our statute, as addressed above, requires the governor to choose an appointee from a list of candidates submitted by the executive committee of the political party to which the vacating legislator belonged *immediately* prior to vacating the office.

We are also compelled to address issues raised during oral argument of this case regarding the constitutionality of the statute and the United States Supreme Court's decision in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982).[3] This Court has consistently held that " '[w]hen the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment.' Syl. Pt. 3, *Willis v. O'Brien*, 151 W.Va. 628, 153 S.E.2d 178 (1967)." Syl. Pt. 3, *State v. James*, 227 W.Va. 407, 710 S.E.2d 98 (2011).

In *Rodriguez*, the United States Supreme Court held that no provision of the federal Constitution expressly mandates any particular procedure to be followed by the states in filling legislative vacancies. 457 U.S. at 8, 102 S.Ct. 2194. The appointment statute in *Rodriguez* was found to be constitutional, permitting an interim vacancy to be filled by the political party of the legislator who had vacated the seat. The Supreme Court rejected the appellants' contention that they had a constitutional right to elect the representatives and that the legislative vacancies must be filled by special election. 457 U.S. at 10, 102 S.Ct. 2194.

In analyzing the issues raised therein, as well as the underlying statute,[4] the Supreme Court in *Rodriguez* identified several factors which supported the constitutionality of the Puerto Rico statute. For instance, the United States Supreme Court indicated that the Puerto Rico statute did "not restrict access to the electoral process or afford unequal treatment to different classes of voters or political parties." *Id.* at 10, 102 S.Ct. 2194. "All qualified voters have an equal opportunity to select a district representative in the general election; and the interim appointment provision applies uniformly to all legislative vacancies, whenever they arise." *Id.* Additionally, the *Rodriguez* Court explained:

the ... choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico Legislature; however, the effect is minimal, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties.

*Id.* at 12, 102 S.Ct. 2194. "Moreover, the interim appointment system plainly serves the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem." *Id.*

The Supreme Court in *Rodriguez* also explained the nature of the alleged rights of association and equal protection, addressing the appellants' argument that their rights were violated by their exclusion, based on party affiliation, from the election held to

3. *Rodriguez* was not significantly addressed in the petitioners' brief; nor was a constitutional argument based on *Rodriguez* advanced in a thorough manner. We address the constitutional issue evaluated in *Rodriguez* based only upon the discussion which ensued during oral argument.

4. The Puerto Rico statute at issue in *Rodriguez* was interpreted to vest a political party with the power to fill an interim vacancy in the Puerto Rico legislature. 457 U.S. at 14, 102 S.Ct. 2194. The *Rodriguez* case did not involve any alteration in political party between the time of election and the time of vacancy.

select a successor to the legislative office at issue. The Court disagreed, finding both that such argument misconceived the nature of the election and that a statute authorizing a political party to designate an interim replacement did not violate rights of association or equal protection of the laws. *Id.*[5] The Court further emphasized the substantial deference provided to state legislatures in enacting statutes enunciating the appropriate means of filling vacancies within their legislative bodies.[6]

This Court addressed the *Rodriguez* holding in *State ex rel. Robb v. Caperton,* 191 W.Va. 492, 446 S.E.2d 714 (1994). In that case, Justice Miller delivered the opinion of the Court, and we held that a vacancy in the office of a Supreme Court Justice or circuit judge may be filled by the governor by appointment. This Court noted "we are not cited nor are we aware of any federal constitutional attack that has been made successfully on a state's constitutional or legislative enactment for filling vacancies in state offices." *Id.* at 497, 446 S.E.2d at 719.[7] This Court summarized the *Rodriguez* opinion as follows:

> The claim was made that this [Puerto Rico statute] procedure excluded voters who were not members of the political party from voting and, thereby, denied them equal protection. The court in *Rodriguez* found no constitutional infirmity and made

this summary of legal principles: "*No provision of the Federal Constitution expressly mandates the procedures that a state or the Commonwealth of Puerto Rico must follow in filling vacancies in its own legislature....* Moreover, we have previously *rejected claims that the Constitution compels a fixed method of choosing* state or local officers or representatives." 457 U.S. at 8–9, 102 S.Ct. at 2199, 72 L.Ed.2d at 634–35. (Citations and footnotes omitted).

*Robb,* 191 W.Va. at 498, 446 S.E.2d at 720 (emphasis provided). In *Robb,* this Court ultimately upheld the action as required by the constitutional and statutory provisions, finding that "the legislature's language is too plain to interpret" in the manner advanced by the party seeking relief. *Id.* at 496, 446 S.E.2d at 718.[8]

The constitutionality of a political appointment was also challenged in *State ex rel. Herman v. Klopfleisch,* 72 Ohio St.3d 581, 651 N.E.2d 995 (1995). An unsuccessful Democratic candidate challenged the appointment of a Republican officeholder following the resignation of an individual who was elected as a Democrat but then switched to the Republican Party while in office. 651 N.E.2d at 996. The guiding statute was similar to the West Virginia statute, with the exception that it lacked a temporal reference. It provided only that a vacancy was to be

**5.** *See also Trinsey v. Pennsylvania,* 941 F.2d 224 (3d Cir.1991), *cert. denied,* 502 U.S. 1014, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991) (upholding Pennsylvania statute that did not require primary election before general election to fill vacancy in United States Senate); *Lynch v. Illinois State Bd. of Elections,* 682 F.2d 93, 97 (7th Cir.1982) (upholding Illinois election law providing for Mayor to fill aldermanic vacancy by appointment).

**6.** "The methods by which the people of Puerto Rico and their representatives have chosen to structure the Commonwealth's electoral system are entitled to substantial deference." 457 U.S. at 8, 102 S.Ct. 2194.

**7.** In *Robb,* this Court also evaluated a New York decision in *Valenti v. Rockefeller,* 292 F.Supp. 851 (S.D.N.Y.1968), *aff'd,* 393 U.S. 404, 406, 89 S.Ct. 693, 21 L.Ed.2d 635, 636 (1969), wherein a "district court was convened to consider whether New York's election law allowing an election to fill the vacancy in the office for United States Senator to be deferred for twenty-nine months

violated the Seventeenth Amendment to the United States Constitution." *Robb,* 191 W.Va. at 497, 446 S.E.2d at 719. The issue of the extended time period for filling a position by "temporary" appointment was raised in *Valenti.* The *Valenti* court reasoned as follows:

> In this case we are confronted with no fundamental imperfection in the functioning of democracy. No political party or portion of the state's citizens can claim it is *permanently disadvantaged ... or that it lacks effective means of securing legislative reform* if the statute is regarded as unsatisfactory. We have, rather, only the *unusual, temporary, and unfortunate* combination of a tragic event and a reasonable statutory scheme.

*Valenti,* 292 F.Supp. at 851 (emphasis supplied).

**8.** In *Robb,* we were requested, through writ of mandamus, to require the filling of the vacancy left by the resignation of the Honorable John Hey in Kanawha County, West Virginia, at the next general election, in 1994, rather than waiting until the 1996 election.

filled by the central committee "of the political party with which the last occupant of the office was affiliated." *Id.* at 997. Addressing a constitutional challenge to the appointment of a Republican, the Supreme Court of Ohio cited *Rodriguez* for the proposition that no particular procedure is mandated for the filling of vacancies in a state legislature. The court in *Herman* found the Democratic challenger's constitutional argument unavailing. *Id.* at 999.[9]

Examining the West Virginia statute in light of the principles addressed by the United States Supreme Court in *Rodriguez*, this Court finds no basis upon which to find our statute unconstitutional. To the contrary, the *Rodriguez* decision emphasized the considerable latitude enjoyed by each state with respect to procedures for filling vacancies in state government. 457 U.S. at 12, 102 S.Ct. 2194. Of note was the observation that the choice of filling vacancies by appointment rather than by special election may affect the rights of the citizens to elect its members of the Puerto Rico legislature. *Id.* However, the effect was deemed "minimal" in *Rodriguez* and not to fall disproportionately on any discrete group of voters by applying the statute's provisions. *Id.* Likewise, the West Virginia statute's effect on the rights of the citizens of this state to elect specific members of the West Virginia Legislature is minimal. The effect does not fall disproportionately on a discreet group of voters or political parties and affects both political parties equally, depending in each instance upon the party affiliation of the person creating a vacancy. Equal treatment of voters, based upon an unforeseeable event such as the changing of political parties and a subsequent vacancy, does not constitute a violation of equal protection.

In ruling on this mandamus action, we emphasize that a judicial determination of whether a vacancy statute is ambiguous is *not* a political decision. Although a court might profoundly disagree with a particular statute or may even prefer another outcome, the judiciary is prohibited from substituting its judgment for that of the legislative branch, an action tantamount to improperly assuming the role of legislators.[10] Were this Court to rewrite the clause in an inauspicious attempt to achieve any certain result, we could legitimately be accused of legislating from the bench. Euphemistic reliance on statutory interpretation to obtain a specific result would frustrate the tripartite principles of government upon which this state was founded and still firmly rests.

Resolution of this dispute is purely a matter of statutory application, be it a Democrat transforming into a Republican, or a Republican becoming a Democrat. The statute applies with equal force to each situation and must be interpreted in precisely the same fashion regardless of the underlying party disloyalty demonstrated by the changeling. In the final analysis, we affirm the primacy of the Legislature's power to enact statutes and this Court's constitutional mandate to apply the laws as written. Our decision is grounded in law, not in ideology or politics.

### IV. Conclusion

Based upon the foregoing, this Court finds no ambiguity in West Virginia Code § 3–10–5. Accordingly, we deny the requested writ of mandamus seeking to direct the Governor to fill the current vacancy in the West Virginia Senate from a list of three candidates to be selected by the petitioners. The vacancy is to be filled according to the explicit provisions of the statute, from a list of three candidates to be selected by the respondent West Virginia Republican Executive Committee for the Ninth Senatorial District, based

---

**9.** The court in *Herman*, despite its finding that the statute was ambiguous because it did not contain a temporal reference to the time of election or the time of vacancy, found no violation in the seating of a Republican to replace the officeholder who had run as a Democrat and changed to the Republican Party while in office. 651 N.E.2d at 996.

**10.** In a democratic society, the power to make the law rests with those chosen by the people. The judiciary's role, however, is significantly more confined. We are asked only "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803); *see e.g., I.N.S. v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (observing that statute's "wisdom is not the concern of the courts.").

upon Senator Hall's most recent affiliation with the Republican Party.

The Clerk is ordered to issue the mandate in this case forthwith.

Writ denied.

### Chief Justice KETCHUM, concurring:

I realize that my vote in this case effectively eliminates any chance of my being reelected to our Supreme Court. Nevertheless, I took an oath to impartially apply our laws and I promised to set political favoritism aside. The statute in this case is clear. The appointment by the Governor is to be made from a list of persons submitted by the executive committee "of the party with which the person holding the office immediately preceding the vacancy was affiliated." Senator Hall was a registered Republican when he vacated the office. So be it!

Therefore, I concur.

### LOUGHRY, Justice, concurring:

While courts are occasionally called upon to resolve a legal issue at the heart of a political dispute, neither this Court nor any court is constituted for the purpose of being played as a political trump card. Here, the petitioner Democratic Party alleges a lack of clarity in a statute that is perfectly clear. In fact, the clarity with which the subject statute addresses the precise issue presented leads to the inescapable conclusion that this extraordinary proceeding is a thinly-veiled attempt to bait the members of this Court into a partisan resolution. I am reassured that a majority of this Court refused to do so, as reflected in its well-reasoned opinion utilizing the canon of statutory construction

1. See *Boatright*, 184 W.Va. at 29, 399 S.E.2d at 59 (quoting *Cooper v. Tazewell Square Apartments, Ltd.*, 577 F.Supp. 1483, 1487 (W.D.Va. 1984), *rev'd on other grounds*, 606 F.Supp. 1397 (W.D.Va.1985)) ("When the statute is unambiguous on its face, there is no real need to consider its legislative history.").

2. A writ of election to fill a vacancy in the legislature shall be issued by the governor when the vacancy occurs during the recess of the legislature, and by the president of the senate or speaker of the house of delegates, as the case may be, when such vacancy happens during the session, or has not been previously filled. The

that "follow[s] the statute's plain, unambiguous language." *State v. Boatright*, 184 W.Va. 27, 29, 399 S.E.2d 57, 59 (1990). I also believe that any layperson would have reached the same, inescapable conclusion:

West Virginia Code § 3–10–5, states, in pertinent part, as follows:

(a) Any vacancy in the office of State Senator ... shall be filled by appointment by the Governor, from a list of three legally qualified persons *submitted by the party executive committee of the party with which the person holding the office immediately preceding the vacancy was affiliated.* ... If the list is not submitted to the Governor within the fifteen-day period, the Governor shall appoint within five days thereafter a legally qualified person *of the same political party as the person vacating the office.*

W.Va.Code § 3–10–5 (2013) (emphasis added). While the Court need not consider the legislative history of this unambiguous statute,[1] such history makes clear that the statute accommodates, and specifically contemplates, the issue presented.

When West Virginia Code § 3–10–5 was enacted in 1863, and for the following sixty years, there was no reference to political party affiliation because any vacancy in the state senate that occurred during that period was filled through a "writ of election."[2] In 1925, the statute, then codified as West Virginia Code Chapter 4, § 7, was amended and revised to create separate procedures for filling vacancies in the state senate depending upon whether the departing senator died, or left office by resignation or some other means. When the vacancy was the result of

said writ shall be directed to the sheriff of the proper county, or to the sheriffs of the several counties included in the delegate or senatorial district, as the case may be, and shall prescribe the day of election; and every sheriff, on receiving the same, shall immediately give notice thereof to the supervisors and inspectors of election of the several townships of his county; and shall also cause notice of the same to be conspicuously posted at every place of voting in such county, and to be published in the newspapers, if there be any, printed therein.

1863 W.Va. Acts 127.

death, we see the first mention of political parties:

> Whenever a vacancy in the legislature shall occur by the death of a member of the senate, the clerk of the circuit court from which county said senator resided at the time of his election shall immediately notify the chairman and secretary of the senatorial executive committee of said senatorial district *of the political party of which said member of the legislature belonged*, of such vacancy, ... and it shall be the duty of senatorial executive committee to name a person duly qualified under the law to fill the vacancy, and the person so named by the senatorial executive committee *shall be a member of the same political party to which the former senator belonged* and from the county in which he resided at the time of his election, and it shall be the duty of the chairman and secretary of the senatorial executive committee to immediately certify to the governor of the state of the act of the meeting naming a person for the vacancy, and the governor of the state then shall appoint such person to fill such vacancy until a senator is elected at the next general election and has qualified....

W.Va.Code § 4–7 (1925) (emphasis added); *see also* 1925 W.Va. Acts 176.[3] Although the political party language was added in 1925, presumably because vacancies would now be filled by appointment, as opposed to the previously required writs of election, the legislature did not at that time include any temporal language with regard to the "political party of which said member of the legislature belonged[.]"

During the recodification of the West Virginia Code in 1931, the subject statute was redesignated as West Virginia Code § 3–10–6, and provided the following temporal component regarding party affiliation that has remained to this day:

---

3. When the vacancy occurred by "resignation or otherwise than by death," the vacancy continued to be filled through a "writ of election." W.Va. Code § 4–7 (1925).

4. Available legal resources reveal that there are no bound volumes of the West Virginia Code for the years 1926 through 1930. There are, however, bound copies of the Report of the Revision and Codification Commission published in 1927,

> Any vacancy in the office of state senator ... shall be filled by appointment by the governor, in each instance from a list of three legally qualified persons submitted by ... the party executive committee of the state senatorial district in the case of a state senator, *of the party with which the person holding the office immediately preceding the vacancy was affiliated*....

W.Va.Code § 3–10–6 (1931) (emphasis added).[4] Although legislative history in West Virginia is minimal, at best, the 1931 Code contains "Revisers' Notes." For this particular statute, the Revisers' Note commented on the filling of a vacancy in the legislature by appointment, noting that a special election to fill such a vacancy "would incur an unjustifiable expenditure of public funds." *Id.* The Revisers' Note also references the fact that the "'the appointment [will now] be made from a list of *three* submitted by ... the party executive committee of the state senatorial district, as to a state senator[.]" (Emphasis added). This was a change from the statute as it existed in 1925, which provided for the senatorial executive committee to name only one qualified person to fill the vacancy, as indicated above.

In 1963, the legislature repealed chapter three of the West Virginia Code and enacted a new chapter three, "all relating to the establishment, administration and regulation of elections and election procedures[.]" 1963 W.Va. Acts 221. At this time, section 6 (West Virginia § 3–10–6) was redesignated as section 5 (West Virginia Code § 3–10–5). The imposition of the mandatory time limit for the executive committee to submit the list of three names from which the Governor is to fill the senate vacancy, and the consequences if the committee fails to do so, was added by the legislature in 1975, as follows: "If such list is not submitted to the governor within

1928, and 1929. This Commission was appointed pursuant to a legislative act passed in 1921, entitled "An Act providing for the revision, codification and indexing ... of the statute law of West Virginia...." *W.Va. Report of the Revision and Codification Commission* (1927). The Commission's Report sets forth the temporal component that was included in the recodification of the West Virginia Code in 1931.

the fifteen day period, the governor shall appoint within five days thereafter a legally qualified person *of the political party of the person vacating the office.*" W.Va.Code § 3–10–5 (1975) (emphasis added); *see also* 1975 W.Va. Acts 415.[5]

As reflected in the legislative history discussed above, and for the last eighty-five years, West Virginia Code § 3–10–5 has clearly provided that "the party with which the person holding the office *immediately preceding the vacancy* was affiliated[ ]" dictates the party of his or her appointed replacement. W.Va.Code § 3–10–5(a) (emphasis added). It is this temporal component in West Virginia Code § 3–10–5(a) that renders the Kansas and Wyoming cases relied upon by the petitioners inapplicable and unpersuasive to the matter at hand. Unlike the subject statute, the Kansas and Wyoming statutes lacked a temporal provision. *See Wilson v. Sebelius,* 276 Kan. 87, 72 P.3d 553 (2003) (interpreting statutory phrase "of the party" and finding that party affiliation at time of election controls); *Richards v. Bd. of Cnty. Comm'rs,* 6 P.3d 1251 (Wyo. 2000) (finding statutory language "the political party to which the member whose office is vacant belonged" to be ambiguous and concluding that political party to which commissioner belonged at time of his election controlled).[6]

Notwithstanding the clear and unambiguous language in West Virginia Code § 3–10–5(a), the petitioners contend the statute is ambiguous and essentially ask this Court to

amend the statute with language that would require a vacancy in the state senate to be filled by a member of the political party with which the vacating senator was affiliated at the time of his or her election. However, as I have previously explained, " '[c]ourts are not free to read into the language what is not there, but rather should apply the statute as written.' *State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 24, 454 S.E.2d 65, 69 (1994)." *Robinson v. City of Bluefield,* 234 W.Va. 209, 220–21, 764 S.E.2d 740, 751–52 (2014) (Loughry, J., dissenting). In fact, " '[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.' *Martin v. Randolph Cnty. Bd. of Educ.,* 195 W.Va. 297, 312, 465 S.E.2d 399, 415 (1995) (internal citation omitted)." *Robinson,* 234 W.Va. at 220, 764 S.E.2d at 752 (Loughry, J., dissenting). Moreover, when " '[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' " *Todd M.S. v. Julie M.G.,* 230 W.Va. 612, 619–20, 741 S.E.2d 837, 844–45 (2013) (quoting Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951)).

Here, the "immediately preceding the vacancy" language in West Virginia Code § 3–10–5(a) has been in place since at least 1931. During the intervening decades, the legislature could have amended this statute by removing this particular language and replacing it with language that would require looking to the vacating senator's political

---

5. In 2010, the legislature subdivided the statute into its current subsections (a), (b), and (c), and made minor changes to the last sentence of subsection (a), as follows: "If the list is not submitted to the Governor within the fifteen day period, the Governor shall appoint within five days thereafter a legally qualified person of the same political party as the person vacating the office." 2010 W.Va. Acts 951–52. Subsection (c) was revised in 2013 to provide, as follows:

In the case of a State Senator, the list shall be submitted by the party executive committee of the state senatorial district in which the vacating senator resided at the time of his or her election or appointment. The appointment to fill a vacancy in the State Senate is for the unexpired term, unless section one of this article requires a subsequent election to fill the remainder of the term, which shall follow the

procedure set forth in section one of this article.
2013 W.Va. Acts 850–51.

6. In 2004, the Wyoming legislature amended Wyoming Code § 18–3–524 by deleting the word "belonged" in the phrase "of the political party to which the member whose office is vacant *belonged* [;]" by adding language that now reads: "of the political party to which the member whose office is vacant *represented at the time of his election ... or at the time of his appointment if not elected to office* [;]" and by adding subsection (d), which states, in part, that "a person shall be considered to 'represent' a political party if he was a nominee of that political party when elected to office or when appointed to fill a vacancy in office." Wyo. Stat. Ann. § 18–3–524(a) and (d) (emphasis added).

party affiliation at the time of his or her election for purposes of filling the vacancy. It has not done so. Furthermore, ambiguity does not materialize at the mere suggestion of a dispute. The fact that the petitioners have conjured an argument feigning confusion over clear statutory language does not, in itself, create an ambiguity. Importantly, absent ambiguity, this Court is constrained to apply the statute, as written.[7]

When Mr. Hall vacated his senate seat on January 3, 2016, he was affiliated with the Republican Party. Under these facts, and giving full force and effect to West Virginia Code § 3–10–5, as written, I am compelled to conclude that although Mr. Hall was affiliated with the Democratic Party at the time of his election in 2012, his party affiliation at the time he vacated his senate seat controls. W.Va.Code § 3–10–5(a).

Notwithstanding the political nature of the instant matter, "[a]n independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply that law that governs our society." Preamble, Code of Jud. Conduct. As mandated by the Code of Judicial Conduct, a judge "shall not be swayed by public clamor or fear of criticism" and "shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment." Canons 2.4(A) and (B). Indeed,

[a]n independent judiciary requires that judges decide cases according to the law and facts, without regard to whether particular laws or litigants are popular or unpopular with the public, the media, government officials, or the judge's friends or family. Confidence in the judiciary is eroded if judicial decision making is perceived to be subject to inappropriate outside influences.

Official Commentary [1], Canon 2.4. In furtherance of these precepts, it is imperative that judges interpret and apply the law objectively and without regard to whether they personally approve or disapprove of the law in question. Equally imperative to American concepts of justice and the rule of law is that parties respect and abide by judicial decisions.[8]

For these reasons, as well as those expressed by the majority of this Court, I agree that the Governor must select a person from the list of legally qualified persons submitted by the West Virginia Republican Ex-

---

7. Although *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), was mentioned in a footnote in the petitioners' appellate brief, during oral argument, a member of the Court elicited a discussion as to whether *Rodriguez* would call into question the constitutionality of West Virginia Code § 3–10–5. Notwithstanding the absence of any meaningful discussion of *Rodriguez* in the parties' briefs, there are significant differences between West Virginia Code § 3–10–5 and the statutory procedure for filling vacancies under consideration in *Rodriguez*. Further, in *Rodriguez*, the statute allowed the political party of the member whose seat was vacated to make an appointment to fill the vacancy by holding an election among its members. The appellants argued that this procedure, which excluded voters who were not members of that political party from voting, denied them equal protection. Citing its prior rulings, the Court reaffirmed that the filling of a vacancy on an interim basis by appointment, rather than by election, is constitutional and that "[n]o provision of the Federal Constitution expressly mandates the procedures that a state ... must follow in filling vacancies in its own legislature." *Id.* at 8, 102 S.Ct. 2194. The Court further explained

that "Puerto Rico's appointment mechanism is not rendered constitutionally defective by virtue of the fact that the interim appointment power is given to the political party with which the previous incumbent was affiliated." *Id.* at 12, 102 S.Ct. 2194. Importantly, the Court also noted that "[t]he methods by which ... Puerto Rico ... [has] chosen to structure the Commonwealth's electoral system are entitled to substantial deference." *Id.* at 8, 102 S.Ct. 2194. Here, the legislature has chosen to give the party executive committee with which the person holding the office immediately preceding the vacancy was affiliated the authority to name three qualified persons to fill the vacancy. W.Va.Code § 3–10–5; *see also* W.Va. Const. art. VI, § 24 ("Each house shall determine the ... qualifications of its own members."). Accordingly, and as thoroughly explained in the majority opinion, the rulings set forth in *Rodriguez* do not render West Virginia Code § 3–10–5 unconstitutional.

8. *See* Syl. Pt. 1, *United Mine Workers of Amer. v. Faerber*, 179 W.Va. 73, 365 S.E.2d 353 (1986) ("When this Court acts within its jurisdiction, its orders shall be promptly obeyed, or contempt is a proper sanction.").

ecutive Committee for the Ninth Senatorial District to fill the vacancy in the state senate created by Mr. Hall's resignation. Indeed, the Governor has a constitutional duty to fill such vacancies.[9] In the event the voters in the affected senatorial district disapprove of the Governor's selection, those same voters will have the opportunity during the primary and general elections held later this year to select a different person to represent their district in the State Senate. Accordingly, I respectfully concur.

DAVIS, Justice, dissenting:

As observed by the majority, the Court's decision in this case "is grounded in law, not in ideology or politics." I could not agree more with this sentiment, but I strongly disagree with how the law was applied in the Court's decision of this case because the majority has let the exception to statutory construction swallow the rule. Like proverbial deer in the headlights, the parties to the instant proceeding have virtually frozen when faced with the full measure of the legal question presented by this case: the proper construction and application of W. Va.Code § 3-10-5 (2013) (Repl. Vol. 2013). While it was considerate for the parties to evade the pivotal question of this statute's constitutionality to facilitate the Court's decision of this case, such niceties were neither necessary nor prudent. This Court regularly considers and decides issues involving this State's Constitution, and, while addressing the constitutionality of a statutory provision is not always a routine part of this Court's statutory construction, sometimes the constitutional implications of a statute's construction require venturing into that realm. Discerning the meaning and application of W. Va.Code § 3-10-5 requires such a constitutional analysis. Though, on its face, the statutory language appears innocuous, a closer examination of the statute's wording in light of the Legislature's intent in promulgating this provision demonstrates that W. Va.Code § 3-

10-5 cannot constitutionally be applied as it is written because the express language is internally inconsistent, contravenes the underlying legislative intent, and violates the West Virginia Constitution. Because the majority of this Court has insisted on following the lead of the parties and skirted around both the recognition and the resolution of this pivotal constitutional issue, I resolutely dissent.

### Propriety of Addressing Statute's Constitutionality

When this Court encounters a matter of statutory construction, it is customary to adopt an interpretation that is consistent with the commands of this State's Constitution. *See* Syl. pt. 5, *Community Antenna Serv., Inc. v. Charter Commc'ns VI, LLC*, 227 W.Va. 595, 712 S.E.2d 504 (2011) (" 'A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.' Syl. Pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908)."). In this regard, the Court has determined that " 'whenever an act of the legislature can be so construed and applied as to avoid a conflict with the constitution, and give it the force of law, such construction will be adopted by the court.' " *Morris v. Crown Equip. Corp.*, 219 W.Va. 347, 355, 633 S.E.2d 292, 300 (2006) (quoting *Peel Splint Coal Co. v. State*, 36 W.Va. 802, 815, 15 S.E. 1000, 1004 (1892) (citation omitted)). *See also* Syl. pt. 29, *Coal & Coke Ry. Co. v. Conley*, 67 W.Va. 129, 67 S.E. 613 (1910) ("Courts will never impute to the legislature intent to con-

---

**9.** Any suggestion that the Senate is not bound to seat such appointee under the rubric of "judging the qualifications" of its members is misplaced. The legislature has statutorily prescribed the legal qualifications of such member. Once the Governor selects a person to fill Mr. Hall's vacancy from the list of legally qualified persons submitted by the West Virginia Republican Executive Committee for the Ninth Senatorial District, the appointment will be in compliance with the pertinent statutory requirements and this Court's opinion, after which the Senate will be bound to seat the Governor's appointee.

travene the constitution of either the state or the United States, by construing a statute so as to make it unconstitutional, if such construction can be avoided, consistently with law, in giving effect to the statute, and this can always be done, if the purpose of the act is not beyond legislative power in whole or in part, and there is no language in it expressive of specific intent to violate the organic law.").

Nevertheless, while statutory construction generally counsels against constitutionality inquiries, such an analysis may, and simply must, be performed when confronted with a statute that clearly violates the express language of the Constitution of this State. Thus, where, as here, the constitutional question has been raised by the parties,[1] it is certainly permissible to undertake such an analysis when necessary to thoroughly ascertain the meaning of the subject statute and, more particularly, where other constructions of the same statute would lead to unjust, absurd, inconsistent, or *unconstitutional* results. When conducting such a constitutional inquiry, this Court is guided by its holding in Syllabus point 1 of *State ex rel. Appalachian Power Co. v. Gainer*, 149 W.Va. 740, 143 S.E.2d 351 (1965):

In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Despite this countenance, a statute may be invalidated as unconstitutional when it infringes a right specifically guaranteed by this State's Constitution.

It is no objection to the remedy in [a] case, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right.

Syl. pt. 8, *Conley*, 67 W.Va. 129, 67 S.E. 613. *Accord* Syl. pt. 12, *Farley v. Graney*, 146 W.Va. 22, 119 S.E.2d 833 (1960) ("An act of the legislature may be valid in its general scope and broad outline but invalid to the extent that the restrictions imposed thereby are clearly arbitrary and unreasonable in their application to specific property."); *Harbert v. Harrison Cnty. Court*, 129 W.Va. 54, 69, 39 S.E.2d 177, 188 (1946) ("A statute, however, may be unconstitutional and void in its application to a part of its subject matter and valid as to the remainder. It may be constitutional in operation with respect to one state of facts and unconstitutional as to another." (citation omitted)). It is pursuant to this standard that the Court should have decided the case *sub judice*.

### *West Virginia Code § 3–10–5 Violates West Virginia Constitution Article II, Section 2*

While I agree with the majority's facial interpretation of the express language of W. Va.Code § 3–10–5, I disagree that that limited analysis concludes the Court's inquiry. This Court repeatedly has stated that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). Moreover, "[i]n ascertaining legislative intent, effect must be given to *each part of the statute and to the statute as a whole* so as to accomplish the general purpose of the legislation." Syl. pt. 2, *id.* (emphasis added). However, when determining the Legislature's intent in promulgating a particular provision, no single statute can be viewed in isolation; rather, the

---

1. While not artfully addressed or thoroughly briefed, the issue of the constitutionality of the subject statute was undeniably raised and inter-

jected into the parties' arguments regarding the proper construction of W. Va.Code § 3–10–5.

tenor of *all* of the statutes that comprise a given body of law are instructive to ascertaining the legislative intent inherent within a statute. In other words, "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *id.* Thus,

> [s]tatutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly.

Syl. pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975).

The Legislature enacted W. Va.Code § 3–10–5 as part of the voluminous chapter of laws governing elections in this State. *See* W. Va.Code § 3–1–1 (1963) (Repl. Vol. 2013) ("This chapter shall constitute and may be cited as the 'West Virginia Elections Code' and contemplates and comprehends a code of laws for the establishment, administration and regulation of elections and election procedures in the state of West Virginia."). As a legislative enactment, it is to be presumed that this section complies with the mandates of the West Virginia Constitution, and, in particular, article II, section 2 which provides that "[t]he powers of government reside in all the citizens of the State, and can be rightfully exercised only in accordance with their will and appointment." By its express terms, this constitutional command secures the mandate of the electorate in their choice of the people who will represent them and their interests in this State's government. "A constitution is the fundamental law by which all people of the state are governed. It is the very genesis of government. Unlike ordinary legislation, a constitution is enacted by the people themselves in their sovereign capacity and is therefore the paramount law." *State ex rel. Smith v. Gore*, 150 W.Va. 71, 77, 143 S.E.2d 791, 795 (1965). Thus, it is not for this Court to decide whether it will heed this clear constitutional command. Rather, enforcement of rights secured by the Constitution of this great State is engrained in this Court's inherent duty to neutrally and impartially interpret and apply the law. In other words, "[c]ourts are not concerned with the wisdom or expediencies of constitutional provisions, and the duty of the judiciary is merely to carry out the provisions of the plain language stated in the constitution." Syl. pt. 3, *State ex rel. Casey v. Pauley*, 158 W.Va. 298, 210 S.E.2d 649 (1975). This is so because "[t]he provisions of the Constitution, the organic and fundamental law of the land, stand upon a higher plane than statutes, and they will as a rule be held mandatory in prescribing the exact and exclusive methods of performing the acts permitted or required." Syl. pt. 2, *Simms v. Sawyers*, 85 W.Va. 245, 101 S.E. 467 (1919).

It is apparent from reading the various statutes enacted by the Legislature in its definition of this State's election laws that it recognized and heeded the constitutional command announced by article II, section 2. Replete in this body of law are numerous provisions that safeguard a voter's choice of candidate and ensure that his/her vote will be recorded as it was cast. *See, e.g.,* W. Va. Code § 3–1–45 (2003) (Repl. Vol. 2013) (authorizing mandamus proceeding to compel performance of duties required under State's election laws); W. Va.Code § 3–1A–1 (2010) (Repl. Vol. 2013) (forming State Election Commission); W. Va.Code § 3–5–19 (2007) (Repl. Vol. 2013) (defining procedure for filling vacancy in nomination); W. Va.Code § 3–9–9 (1986) (Repl. Vol. 2013) (ensuring secrecy of voter's ballot); W. Va.Code § 3–9–17 (1963) (Repl. Vol. 2013) (imposing criminal penalties for alteration of voter's ballot). *See also* W. Va.Code § 3–3–1 *et seq.* (delineating procedures for absentee voting and handling of such ballots); W. Va.Code § 3–3A–1 *et seq.* (establishing pilot program for voting by mail and process to govern collection and counting of ballots cast in this manner); W. Va.Code § 3–3B–1 *et seq.* (forming uniformed services and overseas voter pilot program and defining procedure for tabulating such

ballots). Still other statutes ensure the integrity of the election process, itself, by requiring candidates for office to pledge to conduct their campaigns in such a manner so as to uphold "the full and free expression of the will of the voters" and to defend "the right of every qualified voter to full and equal participation in the electoral process." W. Va.Code § 3-1B-5 (1995) (Repl. Vol. 2013). *See also* W. Va.Code § 3-5-7(d)(6)(B) (2015) (Supp.2015) (requiring candidate to maintain allegiance to his/her stated political party for specified period by verifying that he/she has been member of same political party for sixty days preceding filing of his/her "certificate of announcement"). And, included within this body of election law is, of course, the nefarious § 3-10-5 which stands at the center of the instant controversy.

I agree with my colleagues that, on its face, this seemingly innocuous provision provides the guidance sought by the parties. However, a closer reading of this statute inevitably reveals internal inconsistencies that I submit render it unconstitutional because it cannot, as it is written, carry out the will of the voters. In subsection *a* of W. Va.Code § 3-10-5, the Legislature references "the party with which the person holding the office immediately preceding the vacancy was affiliated," which the majority correctly interprets as referring to the party that the outgoing legislator belonged to at the time he/she vacated his/her office. However, subsection *c* of this same code section requires "the party executive committee of the state senatorial district in which the vacating senator resided *at the time of his or her election or appointment*" to supply the Governor with the list of names from which a replacement senator is to be appointed. (Emphasis added). These incongruous directives simply do not make sense if the Legislature, as is this Court, is duty-bound to abide by the will of the voters *vis-à-vis* their choice of elected officials.

I understand subsection *c* to refer to the party executive committee of the state senatorial district from which the outgoing senator was *elected* so as to ensure that the representational balance of the Senate is maintained even if the senatorial districts

might be reconfigured, as has happened in this case between the time of Senator Hall's election and his resignation. Such balance can be achieved only by maintaining the *status quo* sanctioned by the voters, *i.e.*, ensuring both the same geographical area and the same political party that elected the vacating senator are responsible for nominating his/her replacement. Recognizing and safeguarding the will of the voters in this manner "serv[es] to protect the mandate of the preceding election[,] ... preserve[s] the 'legislative balance' until the next general election is held[, and] ... make[s] provision for continuity of party representation." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 13, 102 S.Ct. 2194, 2201-02, 72 L.Ed.2d 628 (1982) (citation and footnote omitted). If the Legislature recognizes that it must uphold the voters' right to select their representatives so as to require the replacement senator be chosen from the *same senatorial district as it existed at the time of the election*, it seems, too, that the only way to be certain that the voters' prerogative, *as it existed at the time of the election*, is realized is to also require that the replacement senator be chosen from the *same political party* as that from which the vacating senator served as candidate when he/she was elected to office. Indeed, " 'party selection is more likely to reflect the will of the voters ... for it was the former representative's party ... that won the prior seat.' " *Rodriguez*, 457 U.S. at 12 n. 12, 102 S.Ct. at 2201 n. 12, 72 L.Ed.2d 628 (quoting *Garcia v. Barcelo*, 671 F.2d 1, 6 (1st Cir.1982)).

To interpret W. Va.Code § 3-10-5 in this manner, though, makes it internally inconsistent, as subsection *a* prefers the vacating senator's party affiliation at the time he/she leaves office, while subsection *c*, to comply with the constitutional mandate of the voters secured by article II, section 2, requires the vacating senator's party at the time he/she was elected to nominate his/her replacement. In light of this incongruous and inconsistent result, W. Va.Code § 3-10-5 must be deemed unconstitutional. *See* Syl. pt. 6, *City of Fairmont v. Pitrolo Pontiac-Cadillac Co.*, 172 W.Va. 505, 308 S.E.2d 527 (1983) ("Generally, when a statute or ordinance is declared un-

constitutional, it is inoperative, as if it had never been passed.").

This reading of the statute is even more compelling when viewed in the context of the instant controversy. While it goes without saying that the party-changing scenario presented by the case *sub judice* was not definitively addressed by the subject statute, and perhaps was never even contemplated when it was enacted or amended, that, nevertheless, is the fact pattern to which § 3–10–5 must be interpreted to apply in this case. Although the respondents make much of the changing nature of the election results in recent contests as indicating a change in party support by the voters, that trend simply is not relevant to the instant inquiry. Neither voter demographics nor the political party affiliation of candidates elected in 2014 is instructive to a determination of the will of the voters who elected Senator Hall, as a Democrat, in 2012. It is Senator Hall who has vacated his seat, and who must be replaced by the Governor, not a subsequently elected or differently affiliated candidate. Moreover, it must be remembered that substantial legislative redistricting took place following the 2010 Census, the effects of which were not felt until the 2014 election at which time the *same* Ninth Senatorial District may have represented *different* voters in the 2014 election than it did in the 2012 election. Thus, allegiance to the will of the voters who elected Senator Hall as a Senator from the Ninth District in 2012 requires that a replacement candidate from *both* the *same* geographic area *and* the *same* political party as that represented by then-candidate Hall during the 2012 election be appointed. As noted previously, the *only* way the mandate of the Ninth District's 2012 electorate, as secured by article II, section 2 of the West Virginia Constitution, can be faithfully upheld within the current factual context is to declare W. Va.Code § 3–10–5 to be unconstitutional.

### West Virginia Code § 3–10–5 Violates West Virginia Constitution Article II, Section 4

I also find W. Va.Code § 3–10–5 to be unconstitutional under article II, section 4 of this State's Constitution because this code provision operates to disenfranchise the voters of the political party for whom the vacating legislator served as a candidate when, as here, that legislator subsequently changes political parties and, upon his/her departure from office, is replaced by a person from the legislator's new political party. Article II, section 4 states that "[e]very citizen shall be entitled to equal representation in the government, and, in all apportionments of representation, equality of numbers of those entitled thereto, shall as far as practicable, be preserved." This Court previously has determined this language to be plain: "[w]e believe that Article II, Section 4 of our Constitution is clear in its terms and that the intention thereof is manifest from the language used. It provides for equal representation in government and, additionally, in all apportionments of representation." *State ex rel. Smith v. Gore*, 150 W.Va. at 76, 143 S.E.2d at 794. Thus, it is clear that the voters of this State have the right, guaranteed by this State's Constitution, to elect the individuals who will represent them, and their interests, in this State's Legislature.

Moreover, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). As this Court previously has recognized,

the 'one person, one vote' principle is now firmly established in broad general terms without qualification or exception. *Certainly the right of the voter to equal protection, the right to protection against the dilution or debasement of the weight or force of an individual's vote, is fully as sound, sacred and important* when he is voting on issues involving taxation, public revenue and the promotion of an adequate public school system, as *when he is voting for the* nomination or *election of* a constable, *a state senator,* a governor or any other public official *to represent the voter in government.*

The fact remains that our state constitution has extended the right of the voter into these areas; and when the voter was constitutionally granted the right to vote

on these important issues, he thereby became guaranteed the equal protection of the law under the Fourteenth Amendment and the constitutional right to have his vote accorded the same weight, effect and force as that of any other persons's vote, and thereby he became protected by the constitutional right to have the weight, force and effect of his vote not debased or diluted when considered in relation to the vote of any other person.

*Lance v. Board of. Educ. of Cnty. of Roane,* 153 W.Va. 559, 572–73, 170 S.E.2d 783, 790–91 (1969) (emphasis added), *rev'd on other grounds sub nom., Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971).

I would be remiss if I did not acknowledge that persons who are elected to political office also have a constitutionally protected right: the right to join the political party of their choosing. Syl. pt. 3, *State ex rel. Billings v. City of Point Pleasant,* 194 W.Va. 301, 460 S.E.2d 436 (1995) ("Restrictions that limit an individual's ability to select and change his or her party affiliation implicate the speech and associational freedoms guaranteed by the First Amendment to the United States Constitution and by Sections 7 and 16 of Article III of the West Virginia Constitution. Such restrictions cannot be imposed on these rights unless the restrictions are necessary to accomplish a legitimate and compelling governmental interest and there is no less restrictive means of satisfying such interest."). That is not to say, however, that the whim of the one may trump the will of the many. While the express language of W. Va.Code § 3–10–5 may require replacing a vacating legislator with an individual of the last political party of which the vacating legislator was a member, where, as here, that legislator has changed parties such that the person replacing him/her is a member of a different political party than the one that sponsored the legislator as a candidate for political office at the time he/she was elected, such a replacement procedure effectively frustrates the voters' right to elect the candidate of their choice. "Political candidacies are essentially a coming together of voters to support a particular platform, cause, or leader. Political parties, which are—for better or worse—an integral part of our democratic

system, measure their success through their candidates." *Billings,* 194 W.Va. at 305, 460 S.E.2d at 440. Therefore, it is inevitable that candidates' rights are necessarily tied to voters' rights. Clearly, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on the right strike at the heart of representative democracy." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506, 523 (1964). A citizen's right to vote is not worth much if the law denies his or her candidate of choice the opportunity to run. "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlating effect on voters." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92, 99 (1972). As the United States Supreme Court observed in *Powell v. McCormack,* 395 U.S. 486, 548, 89 S.Ct. 1944, 1977, 23 L.Ed.2d 491, 531 (1969):

> "A fundamental principle of our representative democracy is, in Hamilton's words, 'that the people should choose whom they please to govern them.' 2 *Elliot's Debates,* 257 . . . ."

*Billings,* 194 W.Va. at 305, 460 S.E.2d at 440.

In the case *sub judice,* the voters of the Ninth Senatorial District chose the person who they wanted to represent them during the 2012 senatorial election: Daniel Hall, a candidate representing the Democratic Party. As was his constitutionally-guaranteed prerogative, Senator Hall subsequently parted ways with the Democratic Party and joined the ranks of the Republican Party. Upon his departure from office, however, application of the express language of W. Va.Code § 3–10–5 to name his replacement operates to disenfranchise the voters of the Ninth Senatorial District who, at the time of the 2012 election, selected Daniel Hall of the *Democratic* Party to represent them. This construction, dictated by the statute's plain language, effectively silences the voters' voice and cannot be reconciled with the voters' constitutional right to select a represen-

tative of their choosing guaranteed by article II, section 4.

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. *And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.*" (Italics supplied.)

*Lance v. Board of Educ. of Cnty. of Roane*, 153 W.Va. at 569, 170 S.E.2d at 789 (quoting *Reynolds v. Sims*, 377 U.S. at 555, 84 S.Ct. at 1378, 12 L.Ed.2d 506 (footnote omitted)). *See also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). Application of W. Va.Code § 3–10–5 as endorsed by the majority deprives the voters of their right to elect a candidate of their choosing, and, thus, is unconstitutional as violative of article II, section 4 of the West Virginia Constitution. Because "the judiciary . . . has a role to play in ensuring the [electoral] process retains its integrity and functions as an accurate reflection of the people's will," *Billings*, 194 W.Va. at 307, 460 S.E.2d at 442 (footnote omitted), I simply cannot countenance this incongruous result.

### *Courts are Constituted to Faithfully Interpret and Apply the Law, Not to Advance the Personal Objectives of Individual Justices*

As with all of the views espoused in my opinions, I reach my conclusion that W. Va. Code § 3–10–5 is unconstitutional only after careful consideration and thorough analysis of the parties' arguments and the law governing the subject controversy. As a Justice of this State's highest court, I am honored to have been elected by this State's voters and strive, in every case upon which I sit, to "support the Constitution of the United States and the Constitution of this State" and to "faithfully discharge the duties of [my] office to the best of [my] skill and judgment."

W. Va. Const. art. IV, § 5. I also endeavor to faithfully follow the Canons of Judicial Conduct, which require persons elected to judicial office to "participate in establishing, maintaining, and enforcing high standards of conduct" and to "personally observe those standards so that the integrity and independence of the judiciary will be preserved." W. Va. Code Judicial Conduct Canon 1. *See also* W. Va. Code Judicial Conduct Canon 2 (requiring judge "not to allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment").

When I disagree with a decision endorsed by the majority of this Court, I do so because I interpret the law differently than my brethren. Simply because I do not share my colleagues' point of view, though, does not mean that I do not still respect them both as individuals and for their legal acumen. Rather, I reiterate the eloquent words of President Haymond, who explained his decision to dissent from the majority of the Court thusly: "It should be clearly understood that in expressing my dissentient views, however, in this honest and sincere disagreement between my associates and me, my criticisms are directed, not to them, but to their direction." *Lance v. Board of Educ. of Cnty. of Roane*, 153 W.Va. at 574, 170 S.E.2d at 791 (Haymond, President, dissenting).

We are *all, all five* of us Justices, constitutionally bound to uphold the laws of this State to the best of our ability and to do so with the neutrality expected of the judiciary. As officers of the Court, we are not beholden to personal agendas and do not use our position in the judiciary to advance our private interests. This is what the voters of the State entrusted us to do when they elected us, and this is what we do every day we serve as a Justice of this Honorable Court. The citizens of West Virginia deserve to understand the views I have expressed in this separate opinion explaining the Constitution's vital role in protecting not only their sacred right to vote but also in preserving the sanctity of the choices they make when they cast their ballots. In light of this obligation we *all* have assumed to interpret and apply the law to accomplish justice, I find it

profoundly troubling that a commentary suggesting bias or impugning the integrity of a justice would ever have a place in a separate, concurring opinion—particularly when, by the very virtue of their assumption of office, it is axiomatic that *all* of the Justices of this Court exhibit neutrality and impartiality in their decisions interpreting the law.

It goes without saying that the case *sub judice* presented an interesting challenge for the Court's resolution. On the one hand, the instant proceeding involved a rather straightforward matter of statutory construction. On the other hand, there is entwined with this inquiry a constitutional concern of such great magnitude that the first step in such a statutory analysis, *i.e.*, ascertaining and adhering to the legislative intent, cannot possibly be accomplished without considering and deciding the constitutionality of the subject legislative enactment. While the parties have conceded that they largely abandoned their constitutional arguments in favor of proposing a more simplistic statutory construction analysis, such strategy gives short shrift to the ability of this Court to undertake and determine complicated questions of statutory construction and works a great disservice to the voters of this State whose right to be represented by the candidate of their choosing is at the very heart of their controversy. Although not artfully or thoroughly raised, the Petitioners did interject the constitutionality of W. Va.Code § 3–10–5 into this proceeding so as to permit the Court to determine whether this provision meets constitutional muster. Because the majority ignored this invitation, and its duty, to decide this singularly dispositive issue, I respectfully dissent.